UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOLANDA FRAUSTO,<br><br>　　　　　Plaintiff,<br>　v.<br><br>CALIFORNIA HIGHWAY PATROL, et al.,<br><br>　　　　　Defendants. | Case No. 16-cv-00311-RS |
| NORMAN CORNEJO,<br><br>　　　　　Plaintiff,<br>　v.<br><br>CALIFORNIA HIGHWAY PATROL, et al.,<br><br>　　　　　Defendants. | Case No. 16-cv-00974-RS |
| YOLANDA FRAUSTO,<br><br>　　　　　Plaintiff,<br>　v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>　　　　　Defendants. | Case No. 16-cv-03633-RS |
| NORMAN CORNEJO,<br><br>　　　　　Plaintiff,<br>　v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>　　　　　Defendants. | Case No. 16-cv-03833-RS |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

These four related actions arise from the post-arrest death of John Anthony Cornejo, a twenty year-old man who was stopped by the California Highway Patrol ("CHP") for driving with his headlights off in the pre-dawn early morning. Plaintiffs are the decedent's mother, Yolanda Frausto, and his father, Norman Cornejo. Defendants are the CHP and certain of its officers ("the State defendants"), and the County of Alameda Sheriff's Department and certain of its officers ("the County defendants"). There are four separate actions because plaintiffs initially were represented separately, and because the State defendants were sued in state court prior to their election to waive Eleventh Amendment immunity and remove the actions here. At this juncture, however, plaintiffs are represented by the same counsel, all four cases have been deemed "related" under Civil Local Rule 3-12, and it is appropriate to treat the cases jointly, even if not formally consolidated. Of course, the potential liability of the State and County defendants, including the potential liability of each individual defendant, must still be analyzed separately to the extent the relevant facts and law differ.

Undertaking those analyses, the Court finds that summary judgment is warranted in favor of all defendants for the fundamental reason that the undisputed facts support a conclusion that Cornejo's constitutional rights were not violated, or even assuming a constitutional claim conceivably could be proven, that defendants are entitled to qualified immunity.

## II. BACKGROUND

The following facts are not materially disputed. Around 4:00 a.m., on March 29, 2015, CHP officers observed a vehicle travelling without its headlights illuminated, and initiated a traffic stop. CHP Officer Michael Diehl approached the car and instructed the driver, Cornejo, to get out for a sobriety check. After Cornejo exited the vehicle, he lifted his hand to his mouth. Officer Diehl saw him engage in a chewing motion and instructed him to spit out whatever was in his

mouth. In response, Cornejo stated he was only chewing gum.

Officer Diehl repeated his command one or more times. Cornejo did not comply, and eventually attempted to flee and/or "swiped at Officer Diehl's hands." CHP officers forced Cornejo to the ground and handcuffed him.

Cornejo then claimed to have swallowed the gum. Officer Diehl told him that if he had actually swallowed drugs, CHP would need to call for medical staff to ensure his safety; Cornejo repeated that it was only gum. CHP searched Cornejo's vehicle and discovered "drug paraphernalia." Cornejo was arrested for allegedly delaying and obstructing a police officer and for possession of drug paraphernalia.

CHP initially prepared to transport Cornejo to Santa Rita Jail in Dublin, California. While en route, Cornejo stated that he wanted to go to the "North County" jail, officially known as the Glenn Dyer Detention Facility. Upon arrival at Glenn Dyer, Cornejo was met at the vehicle sally port by Deputy Ivan Stewart, who conducted a medical prescreening interview. The medical prescreening interview requires the deputy on duty to ask the arrestee a number of questions, including whether or not they are under the influence of drugs or alcohol.

While speaking with Deputy Stewart at the vehicle sally port gate, CHP Officer David Hazelwood stated that Cornejo had swallowed something during his arrest, but that Cornejo had claimed it was gum. Deputy Stewart then asked Cornejo if he had swallowed anything, to which he again claimed it was only gum.

Deputy Stewart understood that one of the charges against Cornejo was possession of drug paraphernalia. During his medical prescreening, Cornejo answered all questions in the negative, including whether he was under the influence of drugs or alcohol. Deputy Stewart nevertheless marked "yes" on the form question regarding whether the arrestee was under the influence of drugs or alcohol, and circled "drugs."

County of Alameda Detention and Corrections Policy 11.028 requires that any time an arrestee answers any question on the medical prescreening form in the affirmative, on-duty nursing staff is to be called to the booking station to interview the arrestee and complete the

medical screening form. The County Defendants contend Deputy Stewart did not call for a nurse because Mr. Cornejo answered "no" to all questions, was not presenting any signs of distress, engaged in normal conversation, and was lucid throughout the intake process. Deputy Stewart explained that he checked "yes" despite receiving a negative answer from Cornejo because he was being "extra cautious" and he wanted to give the nursing staff a "heads-up" that Cornejo might have swallowed something, so they could follow up when he received a full medical screening before transfer to a housing unit.

Deputy Kevin Beyrodt then spoke to Cornejo to inform him he was to be placed in a holding cell. Deputy Beyrodt, who knew Cornejo from a previous arrest, questioned him regarding gang affiliations and asked why he had been arrested on this occasion. Cornejo explained he was arrested for resisting arrest and that the CHP suspected he swallowed something, but that he had not. Deputy Beyrodt has testified Cornejo's gait was steady, his speech was not slurred, he did not request any medical attention, or otherwise provide any indication medical attention was warranted.

Cornejo also informed Deputy Beyrodt he was from Southern California and was affiliated with the Sureños gang. The County defendants assert any arrestee who self-identifies as a Sureño is segregated from the general population for his or her own safety. Accordingly, Deputy Beyrodt placed Cornejo in a holding cell that had a phone for him to use and which isolated him from the general population.

Shortly thereafter, Deputy Beyrodt, who was then being assisted by Deputy Aaron Inns, asked Cornejo whether he had swallowed a controlled substance and offered him amnesty, explaining that no further charges would be pursued in the event he admitted to drug ingestion. Cornejo reassured Deputy Beyrodt that he had not taken anything, had not swallowed anything, and was not under the influence of anything at that time. During multiple subsequent visits with Cornejo in the holding cell, Deputy Beyrodt offered him medical attention.

After approximately four visits with Cornejo in the holding cell, Deputies Beyrodt and Inns led Cornejo to the photo station to continue the booking process, where he displayed an

unsteady gait and began to sweat profusely. Cornejo's hands were fidgeting and he was giggling or laughing. The deputies contend, however, that Cornejo was able to stand still for his photo.

Cornejo was then placed in a different holding cell, which was closer to the nurses' station. Deputy Beyrodt checked on Cornejo again and asked why he was sweating. Cornejo said he was warm. Deputy Beyrodt observed that Cornejo was no longer fidgeting with his hands or giggling. Deputy Beyrodt again asked Cornejo if he needed medical attention or anything else, and again informed Cornejo that if he admitted to having swallowed something, he would not face additional charges. Cornejo then admitted to Deputy Beyrodt that he had taken cocaine earlier in the evening, but he asserted he was "good" and did not need any medical attention.

Around 8:16 a.m. on March 29, 2015, between 30 and 45 minutes after Deputy Beyrodt's last visit, Deputy Anthony Fields approached the holding cell where he observed Cornejo lying on the floor. Medical staff was alerted and emergency services were summoned. Cornejo was transported to Highland Hospital where he later died due to a toxic level of methamphetamine in his system.

There appears to be no dispute that Cornejo most likely engaged in the practice of "body stuffing,"— swallowing a controlled substance wrapped in plastic in an attempt to avoid legal consequences. Defendants present expert testimony that while symptoms of methamphetamine intoxication via traditional means of ingestion (smoking, snorting, etc.) present within 20 to 30 minutes, symptoms of methamphetamine intoxication in "body stuffers" can be delayed for many hours from the time of ingestion. From the time of his arrival at Glenn Dyer (5:22 a.m.), until he was discovered on the floor the holding cell (8:16 a.m.), Cornejo had been detained for approximately three hours.

### III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted).  If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial.  *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties.  To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence.  *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987).  "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. DISCUSSION

### A. Constitutional violations

Plaintiffs advance claims against the CHP officers and the Sheriff's deputies for a violation of Cornejo's Fourteenth Amendment rights as a result of alleged deliberate indifference to his medical needs, and claims under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) against the employing agencies for alleged inadequate training and unconstitutional customs and practices.[1]

#### 1. *Deliberate indifference*

To support a cause of action under § 1983 for a failure to provide medical treatment, a plaintiff must establish that the defendants acted with "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 105-05 (1976); *Lolli*, 351 F.3d at 419. Under the deliberate indifference standard, a defendant is liable for denying medical care only if he "knows of or disregards an excessive risk to [a detainee's] health and safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Lolli*, 351 F.3d at 419; *Gibson*, 290 F.3d at 1187. The indifference to serious medical needs must be "substantial" and mere negligence will not suffice. *See Broughton v. Cutter Laboratories*, 622 F.2d 458, 480 (1980). Thus, an "officer must be both aware of acts from which

---

[1] Plaintiffs also assert various claims under state law. In light of the conclusions of this order, those claims are dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.").

the inference could be drawn [that a substantial risk of harm exists] . . . . and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Lolli*, 351 F.2d 419. If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments. *Farmer*, 511 U.S. at 837-838.

Defendants rely heavily on *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), which they acknowledge, as out of circuit authority, is not controlling, but which they argue is persuasive and therefore should be followed. In *Watkins*, the Sixth Circuit ultimately concluded there was no constitutional violation even where the evidence suggested that police officers should have known the decedent swallowed drugs.

In *Watkins*, police officers executed a search warrant at an apartment. They found Watkins in a closet with rock cocaine nearby. *Watkins*, 273 F.3d at 684. After Watkins' arrest, several officers observed him licking his lips and a pink foamy drool coming from his mouth. One officer even noted a "white speck" near Watkins' mouth. *Id*. The officers asked Watkins if he had swallowed drugs, warned him of the dangers of swallowing drugs, and stated he would not face additional charges if he confessed to having done so. *Id*. Watkins denied swallowing drugs, and explained the licking and discharge was the result of knocking his teeth against the bed during his handcuffing. *Id*. The officers did not report their observation to supervisors or jail staff. *Id*.

While in custody, Watkins complained of an upset stomach, appeared to be drunk or high, fell from a chair, and was observed making chewing motions. *Id*. Sheriff's deputies asked Watkins if he had swallowed drugs and informed him again he would not face additional charges. *Id*. Watkins again denied swallowing drugs. *Id* at 684-85. Watkins complained of illness a few more times during custody, before eventually being found unresponsive in his holding cell. *Id*. at 685. The Sixth Circuit determined that no constitutional violation occurred because the evidence was not sufficient to lead a rational trier of fact to conclude the officers or jailers knew Watkins needed medical attention for swallowing drugs. *Id*. at 686.

Plaintiffs offer no competing authority to *Watkins*. Instead, they argue that there is evidence here that defendants *knew* Cornejo was under the influence of drugs. Plaintiffs point to

indications in the record that at least one CHP officer witnessed Cornejo swallowing a "baggie" and to the fact that Deputy Stewart noted on the intake form that Cornejo was under the influence of drugs.[2] Thus, plaintiffs say, *Watkins* is distinguishable.

Nevertheless, even assuming the CHP officers objectively should have known, and subjectively actually believed it to be almost certain that Cornejo had swallowed a bag containing drugs, there is no evidence from which it could be reasonably concluded they acted with deliberate indifference to his medical needs. Cornejo undisputedly denied any need for medical assistance, and undisputedly was displaying no symptoms of medical distress. The CHP officers transported Cornejo to Glenn Dyer, where nursing staff was on duty, and they communicated the relevant information to the sheriff's deputies. While other courses of action might have been appropriate—such as taking Cornejo to a hospital and requiring him to remain under observation there for some extended period of time—there are no facts suggesting the failure to do so rose to the level of constitutional deliberate indifference on the part of the officers. Accordingly, the CHP defendants are entitled to summary judgment in their favor on grounds that no reasonable trier of fact could find they violated Cornejo's rights.[3]

The case against the County defendants presents a separate scenario. It may be true, as they argue, that none of them had directly observed Cornejo swallowing anything. Nonetheless, the evidence is plainly sufficient to support a finding that they, like the CHP officers, at a minimum subjectively believed there was a substantial likelihood that Cornejo had swallowed some quantity of some kind of drugs. Unlike the CHP officers, however, the deputies also observed indications that Cornejo was experiencing the effects of drug intoxication, around the

---

[2] CHP officer Bruno noted on his probable cause declaration that he saw Cornejo swallow a "baggie." In deposition, he testified that was an error, and he had not seen what Cornejo put in his mouth. Nevertheless, there is abundant evidence in the record that could support a finding of fact by a jury that the CHP officers at least strongly suspected Cornejo had swallowed drugs.

[3] The State of California is also entitled to judgment on grounds that is not a "person" subject to liability under section 1983. *See*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

time his photograph was taken.

There is, nonetheless, no evidence suggesting the deputies observed any signs of medical distress. Rather, although Cornejo admitted having ingested cocaine earlier, he assured deputies that he "was good." The undisputed material facts simply do not support an inference that any of the deputies either were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," or actually drew the inference. *Farmer*, *supra*, 511 U.S. at 837. To be sure, the deputies plainly were aware that *if* Cornejo had swallowed drugs of sufficient quantity, he could be at serious risk—they warned him as much when offering him amnesty for any admission he was willing to make.[4] It does not follow, however, that they necessarily should have inferred, or much less did infer, Cornejo actually was at such substantial risk that he needed medical attention or observation above and beyond the level they provided. Accordingly, the County defendants are also entitled to summary judgment on grounds that no reasonable trier of fact could find they violated Cornejo's rights.[5]

2. *Qualified immunity*

The United States Supreme Court recently restated the standards under which law enforcement officers are entitled to qualified immunity.

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known . . . . While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate . . . .

---

[4] It is conceivable, of course, that the deputies, and the CHP officers before them, were acting from other than purely altruistic motives when urging Cornejo to admit to having swallowing drugs, notwithstanding the amnesty offer. That, however, does not give rise to a constitutional violation.

[5] In the absence of constitutional violations by the individual defendants, there is no basis for *Monell* liability. There are no facts to support a claim of custom or policy or inadequate training in any event.

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 16-cv-00311-RS

> In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law . . . .
>
> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. . . .
>
> Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, 137 S. Ct. 548, 551–52 (2017)(internal citations, quotations, and alterations omitted.)

Plaintiffs have virtually conceded they can point to no cases where officers acting under similar circumstances as the CHP officers and/or the Sheriff's deputies here were found to have violated constitutional rights. As such, even assuming there were at least a triable issue of fact as to whether the conduct of the deputies or the officers rose to the level of deliberate indifference, they would be shielded from liability. *See White*, 137 S. Ct. at 552. ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment.")

## IV.  CONCLUSION

Defendants' motions for summary judgment are granted in all four above-captioned cases. Separate judgments will issue.

**IT IS SO ORDERED**.

Dated: March 29, 2017

_____
RICHARD SEEBORG
United States District Judge